## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| The Saint Paul Branch of the National Association for the Advancement of Colored People, Community Stabilization Project, a Minnesota non-profit corporation, Aurora/Saint Anthony Neighborhood Development Corporation, a Minnesota non-profit corporation, Pilgrim Baptist Church, Shear Pleasure, Inc., Metro Bar & Grill, Inc. d/b/a Arnellia's, Rena Moran, Carolyn Brown, Deborah Montgomery, Michael Wright, Leetta Douglas, and Gloria Presley Massey,<br><br>Plaintiffs,<br>vs.<br><br>United States Department of Transportation, The Metropolitan Council, and Federal Transit Administration,<br><br>Defendants. | Civil Action No.:<br><br>**COMPLAINT**<br><br><br><br><br><br><br><br>**Demand for Jury Trial** |

### Introduction

1.  This is an action for declaratory and injunctive relief. Defendants have decided to construct a light rail transit system ("LRT Project") in the middle of University Avenue, Saint Paul, Minnesota. Defendants' actions and decision violate the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331, et seq., the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, et seq., and the Declaratory Judgment Act ("DJA"), 28 U.S.C. §2201(a).

2.  Plaintiffs, individuals and organizations whose members will be directly impacted by the LRT Project, represent and are members of the Rondo Community, an historic African-American community.

3.  For almost 50 years, the Saint Paul African-American community was centered in the old

Rondo neighborhood. Rondo Avenue, stretching from Rice Street to Lexington Boulevard, served as a major artery uniting the economic, social and political aspirations of its residents. In the late 1950s, despite the protest of the community, the United States government ripped up Rondo Avenue for the construction of Interstate Highway 94 ("I-94")– a decision that destroyed hundreds of homes, businesses and social institutions. See Justice Clarence Thomas' dissenting opinion in the United States Supreme Court decision *Kelo v. City of New London, Connecticut, et al.*, 125 S.Ct. 2655, 2687 (2005).

4.  The policy of urban renewal undertaken by local government during the 1970s again displaced the Rondo community. After this displacement, the Rondo community relocated to its present location along University Avenue, the Central Corridor generally, and parts of Saint Paul's east side.

5.  Now, the historic Rondo community faces displacement yet again. The LRT Project is designed to result in the displacement of the existing population along the Central Corridor through gentrification. Moreover, the LRT Project will further the isolation of the Rondo community.

6.  In planning the LRT Project, Defendants failed to prepare an adequate Environmental Impact Statement ("EIS") that adequately addresses the direct, indirect, and cumulative adverse impacts of the LRT Project or adequately considers mitigation of the adverse impacts of the LRT Project.

7.  Plaintiffs request that this Court issue:

    (a)  A declaratory judgment that Defendants are in violation of NEPA;

    (b)  A mandatory injunction directing Defendants to comply with the provisions

of NEPA;

(c) An Order vacating the August 4, 2009, Record of Decision approving the Final EIS; and

(d) An injunction prohibiting Defendants from proceeding with site preparation, construction, the issuance of revenue bonds, right-of-way acquisitions or any other irrevocable actions related to the building of the proposed LRT Project until Defendants' NEPA violations have been corrected.

## Jurisdiction

8. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 and 28 U.S.C. § 1346, because this action involves the United States as a defendant, and it arises under the laws of the United States, including NEPA and the APA. An actual, justiciable controversy exists between plaintiffs and defendant. The requested relief is proper under 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 705 & 706.

## Venue

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e). Plaintiffs reside, and the proposed LRT Project is to be located within this federal district.

## Parties

10. The Saint Paul Branch of the National Association for the Advancement of Colored People ("NAACP") was organized in 1913 and is a local chapter of the nation's oldest and largest civil rights organization with offices located in Saint Paul. The NAACP is committed to maintaining the cohesiveness and integrity of the historic African-American community formerly primarily centered around Rondo Avenue and now primarily centered around

University Avenue in Saint Paul.

11. The NAACP's membership consists of, among others, numerous businesses, African-American individuals, very low income individuals and low income individuals.

12. NAACP members reside, work and own businesses along the University Avenue corridor that is the proposed location of the LRT Project.

13. As set forth in greater detail herein, the interests of NAACP members will suffer, among other impacts, higher taxes, higher rents, the physical division of their community, lost parking, business interruption and displacement through gentrification caused by the LRT Project. NAACP members also suffered from the previous dislocation of the Rondo community caused by I-94 and urban renewal.

14. NAACP's members will be adversely affected and irreparably injured if the Defendants continue to act as alleged herein. These injuries would be redressed by the relief sought.

15. Community Stabilization Project ("CSP") is a Minnesota non-profit corporation with offices located at 801 Selby Avenue, Saint Paul, Minnesota 55103. CSP has constituents that face, among other impacts, higher taxes, higher rents, the further isolation of their community, lost parking, business interruption and displacement through gentrification caused by the LRT Project. CSP constituents also suffered from the previous dislocation of the Rondo community caused by I-94 and urban renewal.

16. As set forth in greater detail herein, the interests of CSP constituents will be adversely affected and irreparably injured if the Defendants continue to act as alleged herein. These injuries would be redressed by the relief sought.

17. Aurora/Saint Anthony Neighborhood Development Corporation ("ASANDC") is a

Minnesota non-profit corporation with offices located at 774 University Avenue, Saint Paul, Minnesota. ASANDC has members that face, among other impacts, higher taxes, higher rents, the physical division of their community, lost parking, business interruption and displacement through gentrification caused by the LRT Project. ASANDC members also suffered from the previous dislocation of the Rondo community caused by I-94 and urban renewal.

18. As set forth in greater detail herein, the interests of ASANDC members will be adversely affected and irreparably injured if the Defendants continue to act as alleged herein. These injuries would be redressed by the relief sought.

19. Pilgrim Baptist Church, established in 1866, is located in the Central Corridor area and its congregation members reside, work and worship in the Central Corridor.

20. Pilgrim Baptist Church has congregation members that face, among other impacts, higher taxes, higher rents, the physical division of their community, lost parking, business interruption and displacement through gentrification and displacement caused by the LRT Project. Pilgrim Baptist Church congregation members also suffered from the previous dislocation of the Rondo community caused by I-94 and urban renewal. These injuries would be redressed by the relief sought.

21. Shear Beauty, Inc., ("Shear Pleasure") owns and operates Shear Pleasure Salon of Beauty, a beauty salon located at 979 University Avenue, Saint Paul, Minnesota. Shear Pleasure will likely experience lost business during the construction phase of the proposed LRT Project as well as attendant increased overhead expenses as a result of increased property values along the Central Corridor. These injuries would be redressed by the relief sought.

22. Metro Bar & Grill, Inc., d/b/a Arnellia's ("Metro Bar & Grill") is a Minnesota corporation that owns and operates Arnellia's, a restaurant/bar/nightclub located at 1183 University Avenue, Saint Paul, Minnesota 55104. Metro Bar & Grill will experience lost business during the construction phase of the LRT Project as well as attendant increased overhead expenses as a result of increased property values along the Central Corridor. These injuries would be redressed by the relief sought.

23. Rena Moran is an individual resident of Saint Paul, Minnesota and resides in and owns a home in close proximity to the LRT Project. Moran faces, among other impacts, higher taxes, lost parking and possible displacement from her residence due to the displacement/gentrification caused by the LRT Project. These injuries would be redressed by the relief sought.

24. Gloria Presley Massey, a member of Pilgrim Baptist Church, is an individual resident of Saint Paul, Minnesota and resides and own property in close proximity to the proposed LRT Project. Massey faces, among other adverse impacts, lost parking and possible displacement from her residence due to the displacement/gentrification caused by the LRT Project. These injuries would be redressed by the relief sought.

25. Carolyn Brown is an individual resident of Saint Paul, Minnesota and rents an apartment located in close proximity to the LRT Project. Brown faces, among other adverse impacts, higher rents resulting from increased property taxes, lost bus service and possible displacement from her residence due to the displacement/gentrification caused by the LRT Project. These injuries would be redressed by the relief sought.

26. Michael Wright is an individual resident of Saint Paul, Minnesota and owns property and

resides in close proximity to the LRT Project. Wright faces, among other adverse impacts, loss of parking and possible displacement from his residence due to the displacement/gentrification caused by the LRT Project. These injuries would be redressed by the relief sought.

27. Deborah Montgomery, a member of both ASANDC and NAACP, is an individual resident of Saint Paul, Minnesota and resides in and owns a home in close proximity to the LRT Project. Montgomery faces, among other adverse impacts, increased traffic, higher taxes, lost parking and possible displacement from her residence due to the displacement/gentrification caused by the LRT Project. These injuries would be redressed by the relief sought.

28. Leetta Douglas, a member of ASANDC, is an individual resident of Saint Paul, Minnesota and resides in and owns a home in close proximity to the LRT Project. Douglas faces, among other adverse impacts, higher taxes, lost parking, decreased bus service and possible displacement from her residence due to the displacement/gentrification caused by the LRT Project. These injuries would be redressed by the relief sought.

29. The United States Department of Transportation ("USDOT") is an executive department of the United States Government.

30. The Federal Transit Administration ("FTA") is an Operation Administration within the USDOT.

31. Defendant Metropolitan Council is the local planning agency primarily responsible for planning the LRT Project and for preparing the EIS that was subsequently adopted and approved by FTA.

## The National Environmental Policy Act

32. Congress enacted NEPA in 1969, directing all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). NEPA's disclosure goals are two-fold: (1) to insure that the agency has carefully and fully contemplated the environmental effects of its action, and (2) to insure that the public has sufficient information to challenge the agency's action.

33. Pursuant to its Congressional mandate, the Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA that are binding on all federal agencies. 42 U.S.C. § 4342, 40 C.F.R. §§ 1500 et seq.

34. The FTA is required under NEPA to prepare, or at least review and adopt, an EIS for any major federal actions significantly affecting the quality of the human environment. 42 U.S.C § 4332(2)( c).

35. An adequate EIS must consider both direct, indirect and cumulative environmental impacts of the proposed action. Direct effects are caused by the action and occur at the same time and place as the proposed project. 40 C.F.R. § 1508.8(a). Indirect effects are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. 40 C.F.R. § 1508.8(b). Both direct and indirect impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." Id. Cumulative impact is "an impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of which agency (Federal or non-Federal) or person undertakes such

actions." 40 C.F.R. § 1508.7.

36. The FTA must also, in a single EIS, evaluate those proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action. 40 C.F.R. § 1502.4(a).

37. NEPA requires that environmental information be made available to public officials and citizens before decisions are made and before actions are taken. 40 C.F.R. § 1500.1 (b). The information must be of high quality. Id. The purpose of this requirement is to ensure that the public has information that allows it to question and understand the decision made by the agency.

38. The NEPA regulations place an affirmative duty on the FTA to disclose and analyze scientific information disagreeing with the type of activity proposed by the agency, or that call into question expected environmental effects of the proposed action. 40 C.F.R. § 1502.24(a)(4).

39. The USDOT Final Order mandates that the FTA determine whether programs, policies, and activities for which they are responsible will have an adverse impact on minority and low-income populations and whether that adverse impact will be disproportionately high. The Final Order states that "disproportionately high and adverse effect on minority and low-income populations" means that either the effects are either:

   (1) predominately borne by a minority population and/or a low-income population, or

   (2) will be suffered by the minority population and/or low-income population and is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the non-minority population and/or non-low-income population.

See 62 F.R. 18380.

### The Central Corridor Light Rail Project

40. The LRT Project is an approximately 11-mile light rail line designed to link Minnesota's Union Depot multi-modal transit hub in downtown St. Paul to the Hiawatha light rail line in Minneapolis. The LRT Project is designed to be constructed along University Avenue, or the Central Corridor, which connects major Twin Cities destinations — downtown Saint Paul, downtown Minneapolis, University of Minnesota, St. Paul's Midway commercial district and the state Capitol.

41. The Central Corridor light rail line will consist of 16 new light rail stations and share five existing stations with the existing Hiawatha light rail line that are located in Minneapolis. The final cost of the Central Corridor light rail line project is estimated to approach $1 billion.

42. Preliminary engineering on the project began in summer 2007. Final design began in 2009. Construction is scheduled to begin later this year, with service scheduled to commence in 2014.

43. As currently proposed, the federal share of the project costs would approach $500 million. The LRT Project also requires funding from the Minnesota State Motor Vehicle Sales Tax and other state and local sources.

44. The LRT Project is intended to have dramatic environmental, economic and social impacts all along the Central Corridor including, but not limited to, business interruption during the construction phase of the LRT Project, increased commercial and residential property taxes, increased residential rental rates, increased commercial rental rates, loss of parking for

residents and businesses, and gentrification/displacement of the existing residents and businesses.

45. The Central Corridor is the location of numerous ethnically diverse neighborhoods, communities and business centers. Individual plaintiffs, and members of plaintiff organizations, reside, do business and worship in these neighborhoods and communities.

46. The LRT Project will likely result in the gentrification of the Central Corridor and the displacement of the African-American community, low-income community and very-low income communities that predominately populate the Central Corridor today. Members/constituents of each plaintiff organization as well as the individual plaintiffs are members of these communities.

47. The LRT Project will result in substantial environmental impacts in the form of noise, pollution, vibration, lost parking, and increased risk of accidents along the Central Corridor.

48. The impacts caused by the addition of more light rail stations to the LRT Project have not been discussed or identified by Defendants in the EIS.

## The Final Environmental Impact Statement
## and
## The Record of Decision

49. The Defendants published the Final EIS on or about June 26, 2009.

50. Many of the Plaintiffs provided the FTA with detailed comments on the Final EIS and made timely demand for inclusion of consideration of additional impacts and mitigation measures that had either been omitted or insufficiently considered in the Final EIS.

51. On or about August 4, 2009, the FTA published the Record of Decision ("ROD") in the Federal Register approving the EIS. The ROD included infrastructure for three additional light rail stations. These three additional light rail stations were not analyzed in the Final EIS.

52. With respect to the LRT Project, Defendants have failed to address any of plaintiffs' concerns other than the three aforementioned new light rail stations.

53. NEPA requires that the EIS contain a discussion of all adverse effects of the Project both during and after construction. This requirement has not been satisfied.

54. Specifically, in identifying the adverse effects of the Project, the EIS addresses air quality, noise, vibration, traffic, parking, transit accessibility, community cohesion, acquisitions and displacements, and placement of system components. EIS, Section 3.8-14. This list is incomplete and, with respect to community cohesion and displacement, the analysis is erroneous.

55. The list of effects on protected populations does not sufficiently detail the adverse impacts of property value increases, attendant tax increases, rental rate increases, business interruption or the issue of gentrification/displacement of the existing community generally.

The failure to consider these impacts in the EIS renders that document insufficient as a matter of law.

56. The LRT Project will result in an increasing share of residential and employment growth as densities increase in the Central Corridor. The development caused by the LRT Project will result in increased property taxes.

57. Increased taxes in the Central Corridor is a negative impact that will affect Plaintiffs. NEPA requires that the EIS contain sufficient analysis of this impact as well as an analysis of mitigation of this impact. The EIS fails in this regard.

58. With respect to "acquisitions and displacements" and "community cohesion" the EIS's analysis is insufficient. The "acquisitions and displacements" section of the EIS addresses only whether the government is going to acquire property. It does not address displacement caused by other admitted adverse impacts of the LRT Project such as property tax increases, rent increases and business interruption during the construction phase of the LRT Project.

59. With respect to "community cohesion" the analysis is insufficient. Although the concern of community cohesion is addressed, the only mitigation offered is the inclusion of "non-signalized pedestrian crossing", the reconstruction of sidewalks. The conclusion in the EIS is that "since no adverse impacts are anticipated to community cohesion, there is no potential for impacts to be disproportionately borne by environmental justice populations." EIS, 3.8-20. This conclusion is erroneous, arbitrary and capricious.

60. The historic Rondo community was originally displaced as a result of the construction of Interstate Highway 94. Thereafter, gentrification or "urban renewal" undertaken by the government during the 1970s again displaced St. Paul's African-American community.

61. After this involuntary displacement, the former Rondo African-American community was confined to its present location along University Avenue as well as in areas of east Saint Paul. Dislocating this community a third time, via the economic engine of gentrification will further destroy community cohesion.

62. Defendants have failed to analyze the LRT Project's impacts of displacement and gentrification on the cohesiveness of the already twice-displaced Rondo community. Defendants have failed to consider the adverse cumulative impacts of the displacement caused by I-94 construction and urban renewal on Plaintiffs.

63. Defendants must also include in the EIS the requisite consideration of appropriate mitigation measures before moving forward with the LRT Project. Defendants have failed to consider adequate mitigation measures with respect to the adverse impacts of the LRT Project.

## CLAIM FOR RELIEF

### Count I

**The Defendants' Failure to Adequately Identify Adverse Impacts of the LRT Project, Adequately Consider Mitigation Measures of The Adverse Impacts of the LRT Project, and Properly Analyze The Entire Scope of the LRT Project Violates NEPA and is Arbitrary and Capricious.**

64. Plaintiffs hereby incorporate by reference all preceding paragraphs.

65. The LRT project is a major federal action that will significantly affect the human environment as defined by NEPA.

66. NEPA and its implementing regulations, 40 C.F.R. §§ 1501.3 and 1508.9, require Defendants to prepare an EIS containing an analysis of adverse environmental effects, including direct, indirect, and cumulative adverse effects, of the LRT Project. 42 U.S.C. § 4332(c)(i); 40 C.F.R. §§ 1502.16, 1508.07, 1508.08.

67. NEPA and its implementing regulations require Defendants to analyze the full scope of the LRT Project in a single EIS.

68. Defendants have violated NEPA by:

   a. Failing to adequately identify and analyze the direct, indirect and cumulative impacts of the LRT Project including, but not limited to, loss of parking, increased property taxes, gentrification, dislocation, and business interruption during the construction phase of the LRT Project.

   b. Failing to adequately consider mitigation measures relating to both the identified impacts of the proposed LRT Project and those impacts that are not sufficiently identified.

   c. Failing to consider the cumulative impacts of other actions, including the displacement caused in the 1950s and 1960s by the construction of Interstate 94 and displacement caused in the 1970s by the government policy of urban renewal.

   d. Improperly "segmenting" the proposed LRT Project so as to omit three planned light

rail stations from the EIS thereby improperly limiting the scope of the Final EIS.

e. Erroneously, arbitrarily and capriciously concluding that "since no adverse impacts are anticipated to community cohesion, there is no potential for impacts to be disproportionately borne by environmental justice populations." EIS, 3.8-20.

f. Failing to properly analyze the disproportionate impacts of the proposed LRT Project on the predominately minority, low-income, and very-income populations along the Central Corridor.

69. As a direct and proximate result of Defendants' failure to comply with NEPA and due to the threat to Plaintiffs' interests resulting from the proposed construction and operation of the LRT Project, Plaintiffs have been injured.

**WHEREFORE**, the Plaintiffs respectfully request that this Court:

A. Declare Defendants have violated the National Environmental Policy Act, 42 U.S.C. § 4331, et seq, by failing to conduct an adequate environmental assessment;

B. Grant Plaintiffs injunctive relief to compel Defendants to comply with the National Environmental Policy Act (42 U.S.C. § 4331, et seq.), prevent irreparable harm, and satisfy the public interest;

C. Award Plaintiffs their costs, disbursements and attorneys fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D. Grant any other relief the Court deems just and necessary.

Dated: January 19, 2010.

**BONNER & BORHART LLP**

*[signature]*

Thomas F. DeVincke (Atty. Reg. No. 301759)
1950 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, MN 55402
Phone: 612-313-0711
Fax: 612-455-2055
*Attorneys for Plaintiffs*