# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

The Saint Paul Branch of the National
Association for the Advancement of
Colored People; Community Stabilization
Project, a Minnesota non-profit corporation;
Aurora/Saint Anthony Neighborhood Development
Corporation, a Minnesota non-profit corporation;
Pilgrim Baptist Church; Shear Pleasure, Inc.; Metro
Bar & Grill, Inc. d/b/a Arnellia's; Carolyn Brown;
Deborah Montgomery; Michael Wright; Leetta
Douglas; and Gloria Presley Massey,

       Plaintiffs,

v.

United States Department of Transportation;
The Metropolitan Council; and Federal Transit
Administration,

       Defendants,

Civil No. 10-147 (DWF/AJB)

**MEMORANDUM
OPINION AND ORDER**

_____

Thomas F. DeVincke, Esq., Bonner & Borhart LLP, counsel for Plaintiffs.

David W. Fuller, and Friedrich A. P. Siekert, Assistant United States Attorneys, United
States Attorney's Office; and Paul D. Barker, Jr., Esq., U.S. Department of Justice,
counsel for Defendants United States Department of Transportation and Federal Transit
Administration.

Paul D. Reuvers, Esq., and Jason J. Kuboushek, Esq., Iverson Reuvers, LLC; and Ann K.
Bloodhart, Esq., and Donald J. Mueting, Esq., Metropolitan Council.

_____

# INTRODUCTION

Plaintiffs The Saint Paul Branch of the National Association for the Advancement of Colored People (the "NAACP"), Community Stabilization Project, Aurora/Saint Anthony Neighborhood Development Corporation, Shear Pleasure, Inc., Metro Bar & Grill, Inc. d/b/a Arnellia's, Carolyn Brown, Deborah Montgomery, Michael Wright, Leetta Douglas, and Gloria Presley Massey (together, "Plaintiffs") bring this action against United States Department of Transportation ("US DOT"), Federal Transit Administration ("FTA") (together, "Federal Defendants"), and the Metropolitan Council (collectively, "Defendants" or "Agencies").

Plaintiffs claim that Defendants violated the National Environmental Policy Act, 42 U.S.C. § 4331, *et seq*. ("NEPA"), and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA"), by preparing a deficient Final Environmental Impact Statement ("FEIS") for the Central Corridor Light Rail Transit project ("CCLRT Project" or "Project").[1] Plaintiffs seek an injunction ordering Defendants to prepare an adequate environmental impact statement ("EIS") and to enjoin further construction of the CCLRT Project until Defendants have complied with their NEPA obligations. Plaintiffs, Federal Defendants, and the Metropolitan Council each move separately for summary judgment.

---

[1]     The Metropolitan Council, the US DOT, and the FTA all participated in the environmental review process for the CCLRT Project. The FTA is the grant-making agency within the US DOT. Presently, the FTA is providing federal transit assistance to the Metropolitan Council through a grant program aimed at assisting local agencies with mass transportation projects. Under the FTA program, the project must comply with NEPA.

For the reasons set forth below, the Court grants in part and denies in part the pending motions.

## BACKGROUND

The Central Corridor refers to the area that links the central business districts of downtown Minneapolis and St. Paul, Minnesota. (FTA 3516.)[2] The Central Corridor is one of the region's most ethnically, racially, and culturally diverse areas. (FTA 641.) The Central Corridor is also experiencing rapid growth in population, housing, and employment. (*Id*.) The Central Corridor "has a high percentage of minorities, households without automobiles, people with low incomes, and households below poverty level." (*Id*. 644.) Thus, a substantial percentage of the population of the Central Corridor relies on transit to get to work, healthcare facilities, schools, shopping destinations, and for recreation. (*Id*.) Further, the Central Corridor is experiencing transportation problems due to growth and development, such as increased traffic congestion, bus ridership, and travel times. In addition, there is a decreased availability

---

[2] The Administrative Record in this case is labeled and numbered with pagination that corresponds with the certified FTA record. Therefore, unless otherwise noted, all references to the Administrative Record are cited as "FTA."

Plaintiffs submitted materials, such as post-agency-decision affidavits, that are outside of the Administrative Record. The Court has read the submissions, but they played no part in the Court's decision. Instead, the Court limited its review to the Administrative Record. Review of agency action is normally confined to the agency's administrative record and Plaintiffs have not presented any compelling reason to supplement the record. *See, e.g, Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004) (explaining that the administrative record may be supplemented only under "extraordinary circumstances"); *Newton County Wildlife Assoc. v. Rogers*, 141 F.3d 803, 807 (8th Cir. 1998).

of affordable parking and a limited ability to expand existing roadways.  (*Id.* 640, 3538, 5094-95.)  For over 20 years, the Central Corridor has been identified as an area where mobility and capacity should be improved.  (*Id*. 3516.)

The portion of the Central Corridor that Plaintiffs describe as their community is referred to in the environmental documents as the Midway East segment.  Midway East comprises the area in St. Paul along University Avenue between Rice Street and Snelling Avenue.  Midway East comprises much of what was, at one time, the Rondo neighborhood and presently contains some of the highest concentrations of minority and low-income populations in the metro area.[3]  (FTA 871-73.)

This case involves alleged inadequacies in the planning of the proposed CCLRT Project.  The Project involves approximately 11 miles of light rail line, 9.7 miles of which will run between downtown Minneapolis and downtown St. Paul.  (FTA 2-4.)  The Project will connect five major activity centers in the Twin Cities, including downtown Minneapolis, the University of Minnesota, the Midway area, the State Capitol complex, and downtown St. Paul.  Approximately 1.2 miles of the line will use the existing Hiawatha LRT alignment in downtown Minneapolis and will connect with five existing

---

[3]     The Rondo neighborhood historically was an African-American community located in St. Paul.  (FTA 3747.)  Plaintiffs point out, and Defendants do not contest, that the Rondo area was devastated when it was divided to build Interstate Highway 94 ("I-94") between Minneapolis and St. Paul.  In particular, Rondo Avenue, which served as a major artery through the neighborhood, was torn up to make way for I-94.  The Rondo community relocated to University Avenue along a portion of the Central Corridor.  (Compl. ¶ 4.)

stations.  (*Id*. 3, 5.)  The CCLRT line will be built primarily along University and Washington Avenues and will include 18 new stations.[4]  (*Id*. 617.)  In the Midway East area, the project calls for seven new stations along University Avenue in St. Paul, located at Rice Street, Western Avenue, Dale Street, Victoria Street, Lexington Parkway, Hamline Avenue, and Snelling Avenue.  (*Id*. 609.)

The purpose of the CCLRT Project is "to meet the future transit needs of the Central Corridor LRT study and the Twin Cities metropolitan region and to support the economic development goals for the Central Corridor LRT study area."  (FTA 3-4.)  The introduction of "fixed-guideway transit to the Central Corridor" was proposed as a "cost-effective measure aimed at improving mobility by offering an alternative to auto travel for commuting and discretionary trips."  (*Id*.)

Over the past three decades, the Central Corridor has been the subject of several transportation studies that have analyzed the feasibility of mass transit options in the area.  (*Id*. 3516.)  For example, in 1999, the Ramsey County Regional Railroad Authority ("RCRRA") initiated the Central Corridor Transit Study to explore transit options for the corridor.  (*Id*. 3516.)  The study evaluated cost effectiveness, mobility and accessibility, and the community and environmental benefits of several transit options.  (*Id*.)  This

---

[4]     Three of these stations (Hamline Avenue, Victoria Street, and Western Avenue) are described in the FEIS as below-grade infrastructure only.  (FTA 5, 617.)  The below-grade infrastructure would allow for station construction at a future date.  The above-grade construction of these stations was not included in the FEIS, but was separately analyzed in the Infill Stations Environmental Assessment.  (Environmental Assessment-Three Infill Stations-*Western, Victoria, and Hamline* and Finding of No Significant Impact dated February 26, 2010 ("FONSI") 10, 208-310.)

study relied on previous transit studies and outlined goals and options for the Central

Corridor.  Tiered screening resulted in three potential options:  University Avenue Light

Rail Transit ("LRT"), University Avenue Busway/Bus Rapid Transit, and I-94 LRT

Alternative.  (*Id*. 7166, 5057.)

In 2001, the RCRRA prepared and issued the Central Corridor Scoping Booklet,

the purpose of which was to identify transportation alternatives to be evaluated in an EIS.

(*Id*. 7162.)  The scoping decision eliminated the I-94 LRT option and advanced the

following options for environmental review:  (1) No-Build; (2) Transportation Systems

Management; (3) Busway/Bus Rapid Transit; and (4) University Avenue LRT. (*Id*.

7162-7163.)[5]

In April 2006, the Agencies published the Central Corridor Alternatives Analysis

and Draft Environmental Impact Statement ("AA/DEIS").  The AA/DEIS proposed two

build alternatives—a LRT or Busway Rapid Transit for the Central Corridor.  (*Id*. 5056.)

The AA/DEIS contained an analysis of the purpose of and need for such a project,

alternatives to the two projects, and the environmental, economic, and social impacts of

the projects.  Specifically, the AA/DEIS noted that the project goals of the CCLRT were:

(1) economic opportunity and investment; (2) communities and environment; and

---

[5]     As part of the scoping process, the RCRRA collected written and verbal comments
via mail, its website, and at formal public scoping meetings.  (*Id*. 5503.)  The comments
were incorporated into the selection of the proposed alternatives and the design of the
impact assessment criteria, and were used to define factors to be addressed in the EIS.
(*Id*. 5503-5504.)

(3) transportation and mobility.  (*Id*. 5059.)  After the publication of the AA/DEIS, there was a public comment period.

During the public comment period, more than 570 people attended four public meetings and more than 900 parties (people, agencies, and organizations) commented on the AA/DEIS.[6]  (FTA 6, 3940-3941.)  Some comments were directed at the impacts that the CCLRT would have on the Rondo community that was displaced in the 1960s as a result of the I-94 project and during "urban renewal" policies of the 1970s.  Other comments expressed concern regarding the effects of gentrification on minority populations and the need for business interruption mitigation for low-income and African-American businesses impacted during construction.  The comments received influenced the identification of "key issues" for resolution, including analysis of additional LRT stations at Hamline Avenue, Victoria Street, and Western Avenue; analysis of parking impacts; analysis and identification of additional pedestrian crossings on University Avenue; reconstruction of sidewalks and other streetscaping improvements; and formation of a committee representing neighborhoods and communities along the Central Corridor.  (FTA 6.)

Upon completion of the public hearings, the Metropolitan Council (who replaced the RCRRA as the lead agency on the CCLRT Project) adopted the AA/DEIS Locally Preferred Alternative for the Central Corridor—the University LRT Alternative.  On

---

[6]     Of these comments, 684 favored LRT, 92 opposed LRT, and 140 expressed no opinion.  (FTA 6.)

February 25, 2008, the Agencies published a notice of intent to prepare a Supplemental

DEIS ("SDEIS").  The SDEIS was intended to communicate changes to the CCLRT,

including the potential additional/infill stations at Hamline Avenue, Victoria Street,

and/or Western Avenue.  (FTA 3513, 3519-3524.)  The Agencies again received public

comments, including comments that addressed the displacing effect of the CCLRT,

business interruption, and potential cumulative impacts on the Rondo community.  The

comment period for the SDEIS occurred during summer 2008, during which three public

hearings took place.  The Agencies received approximately 70 comments on the SDEIS.

The comments led to, among other things, the addition of below-grade infrastructure for

three infill stations at Hamline Avenue, Victoria Street, and Western Avenue.  (*Id*. 6.)

The CCLRT Final EIS ("FEIS") was published on June 26, 2009.  (FTA 7.)  The

FEIS totals approximately 2,800 pages and incorporates both the AA/DEIS and SDEIS

by reference.  (*Id*. 636.)  The FEIS considered three alternatives:  (1) No-Build

Alternative; (2) Baseline Alternative (reflecting the "best that can be done" to improve

transit without major capital investment); and (3) the Preferred Alternative consisting of a

LRT system in the Central Corridor.  (*Id*. 4, 685-86.)  In the FEIS, the Agencies

considered the impacts of the LRT option and the other alternatives, including potential

social effects on land use and socioeconomics; neighborhoods, community services, and

community cohesion; displacement and relocation; cultural resources; parklands and

recreation areas; visual quality and aesthetics; safety and security; and environmental

justice populations.[7]  (FTA 700-891.)  The FEIS also considered environmental impacts

of the project.  (*Id*. 892-1026.)  In its discussion of potential environmental justice issues,

the FEIS examined both long-term implications for environmental justice communities

and short-term construction impacts.  (*Id*. 868.)  The FEIS compared the potential

impacts of each alternative on environmental justice communities with respect to air

quality, noise, vibration, parking, traffic accessibility, community cohesion, acquisitions

and displacements, and placement of system components.  (*Id*. 881.)

The FEIS also noted that numerous comments were received from public entities,

community groups, non-profit organizations, private entities, public officials, regulatory

agencies, and the general public.  (FTA 7-12.) With respect to environmental justice, the

Agencies noted that the "USEPA recommended specific plans for loss of on-street

parking, completion of the three additional stations at Hamline Avenue, Victoria Avenue

and Western Avenue, and continued discussions with the Rondo community about

cumulative impacts of the project on community cohesion and function."  (FTA 8.)  The

FEIS also noted that following publication of the AA/DEIS, "numerous comments were

received concerning access and mobility within and particularly across the corridor, with

particular concerns raised about the possibility of the LRT creating a physical barrier

between neighborhoods on either side of University Avenue."  (*Id*. 885.)  In response to

---

[7]     "Environmental justice populations" include both minority and low-income
populations.  (FTA 868.)

community concerns, a number of accommodations were made to the project to enhance community cohesion.  (*Id*. 886.)

The FEIS also outlined accommodations and mitigation measures related to potential impacts, including impacts to communities in Midway East.  These measures included plans to minimize noise and vibration impacts and to relocate traction power substations.  (*Id*. 882, 887.)  In addition, measures were taken to mitigate loss of on-street parking.  (*Id*. 884.)  With respect to the environmental justice community, the FEIS noted measures taken to mitigate a decreased level of bus service.  (*Id*. 889-890.)

Ultimately, after conducting the NEPA analysis, the Agencies concluded that the CCLRT would provide, among other things, increased transit access to employment and activity centers, significant travel time savings, and the creation of jobs through new development along the LRT route.  (*Id*. 18.)  In addition, the Agencies concluded that "substantial benefits that will accrue to the minority, low-income, and transit dependent populations more than offset nearly all of the potential adverse impacts of the Project." (*Id*.; *see also* 887-888 (noting offsetting benefits).)  Moreover, the Agencies concluded that the AA/DEIS, SDEIS, and FEIS all indicated "that there are no disproportionately 'high and adverse' effects on minority and/or low-income populations."  (*Id*. 17-18.) Instead, the Agencies noted that the "potential adverse effects are not predominantly borne by a minority or low-income populations [sic]," but rather that "the potential adverse effects are shared by all populations along the proposed route, including non-minority and non-low-income populations."  (*Id*.)

On August 2009, the FTA issued its Record of Decision ("ROD"). In it, the

Agencies noted that:

> The purpose and need for the Central Corridor LRT project was documented in the 2006 AA/DEIS, the 2008 SDEIS, and in the June 2009 FEIS. The purpose of the Central Corridor LRT is to meet the future transit needs of the Central Corridor LRT study and Twin Cities metropolitan region and to support the economic development goals for the Central Corridor LRT study area. The Metropolitan Council's regional 2030 Transportation Policy Plan identified this corridor as a top priority for early implementation. Due to increasing traffic congestion and major redevelopment in the physically constrained corridor, a need currently exists for an alternative to auto travel. The introduction of fixed-guideway transit to the Central Corridor is proposed as a cost-effective measure aimed at improving mobility by offering an alternative to auto travel for commuting and discretionary trips. The Central Corridor LRT would help to minimize congestion increases, offer travel time savings, provide better transit service and capacity to the diverse population of existing and future riders in the corridor, and optimize significant public investments in the regional transit system.

(FTA 3-4.) Appendix C of the ROD contains the Agencies' responses to comments received during the FEIS period. (FTA 84-111.) These comments include, but are not limited to, concerns regarding business impacts during construction, as well as the potential for gentrification and dislocation of existing communities. (*Id*. 88-89.)

In their Complaint, Plaintiffs allege a single count under NEPA. Plaintiffs assert that they are entitled to summary judgment because: (1) the FEIS fails to adequately analyze the cumulative impact of displacement/gentrification caused by the CCLRT, construction of the I-94, and urban renewal policies of the 1970s; (2) the FEIS fails to adequately analyze and consider mitigation of the business interruption caused by the construction of the CCLRT; (3) the FEIS does not adequately analyze or consider mitigating the displacement of Central Corridor residents and businesses; and (4) the

FEIS lacks the requisite scope because it does not analyze the entire CCLRT Project.[8] Because of these alleged deficiencies, Plaintiffs seek an order vacating the ROD, directing the Agencies to prepare an adequate EIS, and enjoining further construction on the CCLRT until the Agencies have complied with their NEPA obligations.

Defendants oppose Plaintiffs' motion and move for summary judgment on Plaintiffs' claims, asserting that the FEIS adequately considered the cumulative effects of past actions, adequately identified business impacts and considered mitigation, adequately discussed mitigation for businesses and residences that may be adversely impacted, and did not require supplementation. Defendants further argue that even if the Court determines that there has been a NEPA violation, an injunction would be unjustified under the present circumstances.

## DISCUSSION

### I.      Summary Judgment Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural

---

[8]      In their Complaint, Plaintiffs allege additional reasons that Defendants violated NEPA but do not pursue those theories in either their motion for summary judgment or opposition to Defendants' motions.

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986).

## II. Scope of Review

Plaintiffs' claims are brought under the judicial review provisions of the APA. Under the APA, the reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A). *See also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375 (1989); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The Court considers whether Defendants considered the relevant factors and whether they made a "clear error of judgment." *Motor Vehicles*, 463 U.S. at 43. This standard of review is narrow and gives agency decisions a high degree of deference. *Sierra Club v. Envtl. Prot. Agency*, 252 F.3d 943, 947 (8th Cir. 2001). An agency's rule is arbitrary and capricious if it (1) relied on factors Congress did not intend

it to consider; (2) "entirely failed to consider an important aspect of the problem"; (3) offered an explanation that runs counter to the evidence before the agency; or (4) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles*, 463 U.S. at 43.

NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 837 (8th Cir. 1995). An agency may first prepare an environmental assessment ("EA") to determine whether an EIS is required. 40 C.F.R. § 1508.9(a)(1). An EA is a "concise, public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." *Id.* An EA must include "brief discussions" regarding the need for the proposed action, alternatives, the environmental impacts, and a listing of agencies consulted. 40 C.F.R. § 1508.9(b). If an EIS is not required, the agency may issue a finding of no significant impact ("FONSI").

If an EIS is required, it must contain a "detailed statement" on the environmental impact of the proposed action, any unavoidable adverse environmental effects of the proposed action, and the alternatives to the proposed action. *See Kleppe v. Sierra Club*, 427 U.S. 390, 401-02 (1976). NEPA requires that an EIS consider the potential direct, indirect, and cumulative impacts[9] of a proposed action. 40 C.F.R. § 1508.25(c).

---

[9]     Effects and impacts are used synonymously in the NEPA regulations. 40 C.F.R. § 1508.8.

"Direct impacts" "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). "Indirect impacts" are those effects caused by the action that are reasonably foreseeable but later in time or farther removed in distance. 40 C.F.R. § 1508.8(b). A "cumulative impact" is

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. Effects under NEPA include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative" effects. 40 C.F.R. § 1508.8.

A cumulative impacts analysis "must be sufficiently detailed to be 'useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts and must rely on some quantified or detailed information.'" *Habitat Educ. Ctr., Inc. v. Bosworth*, 363 F. Supp. 2d 1070, 1079 (E.D. Wis. 2005) (*quoting Lands Council v. Vaught*, 198 F. Supp. 2d 1211, 1245 (E.D. Wash. 2002)).

The EIS must also discuss "means to mitigate adverse environmental impacts." 40 C.F.R. § 1502.16(h), 1508.25(b)(3). Mitigation includes:

> (a) Avoiding the impact altogether by not taking a certain action or parts of an action.
>
> (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

40 C.F.R. § 1508.20.

"[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *Marsh*, 490 U.S. at 373-74. Instead, an EIS need only be supplemented if substantial changes are made to the proposed action or new information arises that will affect the quality of the human environment "in a significant manner or to a significant extent not already considered." *Id*. at 374.

The requirements imposed by NEPA are procedural and do not impose substantive results on agencies. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) (NEPA prohibits uninformed, not unwise, agency action). Plaintiffs bear the burden of demonstrating that Defendants' actions violate NEPA and the APA. *South Dakota v. U.S. Dept. of Interior*, 423 F.3d 790, 800 (8th Cir. 2005). Notably, NEPA does not allow a court to substitute its judgment for that of an agency as to the environmental consequences of the agency's actions. A court's review is only to "insure that the agency has taken a 'hard look' at the environmental consequences." *Kleppe*, 427 U.S. at 410 n.21.

### III.    Plaintiffs' NEPA Claims

Plaintiffs argue that the Defendants' environmental review of the CCLRT Project violates NEPA in four ways:  (1) failing to adequately analyze the cumulative impact of displacement/gentrification caused by the CCLRT, construction of the I-94, and urban renewal policies of the 1970s; (2) failing to adequately analyze and consider mitigation of the business interruption caused by the construction of the CCLRT; (3) failing  to adequately analyze or consider mitigating the displacement of Central Corridor residents and businesses; and (4) for lack of the requisite scope because it does not analyze the entire CCLRT Project.  The Court considers each argument in turn.

### A.    Cumulative Impacts of Prior Projects

Plaintiffs allege that the FEIS fails to adequately identify or consider the cumulative impacts of the construction of I-94 and the current CCLRT Project on Plaintiffs' community.  Plaintiffs' community includes the African-American community of the Central Corridor as well as St. Paul's Rondo community.  Plaintiffs assert that they asked the Metropolitan Council to consider prior government actions that have impacted the neighborhood, but that the FEIS did not consider the issue of the past dislocation of the Central Corridor African-American community.  In particular, Plaintiffs assert that the construction of I-94 brought direct physical displacement to the Rondo neighborhood and that the CCLRT now brings indirect displacement.

As explained above, the cumulative impacts analysis must be sufficiently detailed to be "useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts and must rely on some quantified or detailed information."

*Lands Council,* 198 F. Supp. 2d at 1245.  In a 2005 memorandum, the Council for

Environmental Quality ("CEQ") provides additional guidance on the disclosure of

cumulative impacts under NEPA:[10]

> [T]he effects of past actions may warrant consideration in the analysis of
> the cumulative effects of a proposal for agency action.  CEQ interprets
> NEPA and CEQ's NEPA regulations on cumulative effects as requiring
> analysis and a concise description of the identifiable present effects
> of past actions to the extent that they are relevant and useful in analyzing
> whether the reasonably foreseeable effects of the agency proposal for action
> and its alternatives may have a continuing, additive and significant
> relationship to those effects. . . .  Based on scoping, agencies have
> discretion to determine whether, and to what extent, information about the
> specific nature, design, or present effects of a past action is useful for the
> agency's analysis of the effects of a proposal for agency action and its
> reasonable alternatives.  Agencies are not required to list or analyze the
> effects of individual past actions unless such information is necessary to
> describe the cumulative effect of all past actions combined.  Agencies
> retain substantial discretion as to the extent of such inquiry and the
> appropriate level of explanation. . . . *Generally, agencies can conduct an
> adequate cumulative effects analysis by focusing on the current aggregate
> effects of past actions without delving into the historical details of
> individual past actions.*

*See* http://ceq.hss.doe.gov/nepa/regs/Guidance_on_CE.pdf.  (Emphasis added.)

Defendants assert that the FEIS, in large part, addressed the effects of the I-94

construction on the Rondo community when it considered the existing conditions.

Plaintiffs contend that this analysis arbitrarily limited the required cumulative impacts

analysis.  The Court respectfully disagrees.  The CEQ allows agencies to focus on

current aggregate effects of past actions.  The Court looks to that analysis when

---

[10]     CEQ's interpretation of NEPA is entitled to substantial deference.  *Andrus v.
Sierra Club*, 442 U.S. 347, 358 (1979).

determining whether the overall analysis of cumulative impacts is "sufficiently detailed" to be useful in deciding whether or how to alter a project to lessen cumulative impacts. Thus it is less important *where* the analysis occurs, so long as it is apparent on the record as a whole that the Agencies "made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making." *Colorado Envtl. Coalition v. Dombeck*, 185 F. 3d 1162, 1177 (10th Cir. 1999).

Here, the administrative record demonstrates that Defendants were well aware of the negative consequences that the construction of I-94 had on the Rondo neighborhood.[11] Indeed, the record reflects that Defendants understood that the Rondo

---

[11] The Metropolitan Council notes that in response to community concerns regarding disproportionate impacts from the operation of the CCLRT, it conducted a Title VI review of the impacts of the proposed changes in transit service. (FTA 885.) That review determined:

> Based on these results, this Title VI review of the CCLRT SDEIS finds that the project does not result in a discriminatory impact on minority or low-income communities. While there are several minority areas that do have adverse impacts, the overall impact of the project is positive on both minority and non-minority areas and there is not a statistically significant variance between the positive impacts of the project in minority versus non-minority areas.

(FTA 11607.) The parties dispute the impact of this review. The Court relies on the review only to the extent that it demonstrates that the Agencies were aware of potential negative impacts on minority and low-income areas.

neighborhood was devastated after being "cut in half" by the construction of I-94.[12]  In

particular, the AA/DEIS noted:

> Better transit would play a pivotal role in acknowledging the character and aspirations of places in the Study Area and in the region as a whole.  The Central Corridor has local neighborhoods that collectively form the heart of the Twin Cities Metropolitan Area.  This distinction is expressed, for example, in the annual Rondo Days festival.  *The Ronda area, one of the city's most diverse communities, was virtually destroyed when it was cut in half in the 1960s to build I-94 between Minneapolis and St. Paul.*

(FTA 5100 (emphasis added).)  In addition, the FEIS stated:

> Concerns regarding community cohesion are brought into sharper relief by a sensitive understanding of the history of what was known as the Rondo neighborhood and which encompassed the environmental justice community between Lexington Parkway and Rice Street.  The Rondo community, a historically African-American community, was devastated with the construction of Interstate Highway 94 in St. Paul during the 1960s.

(FTA 885.)  The FEIS further indicated that "[t]he stakeholders that are engaged in

the planning for the Central Corridor LRT remain committed to ensuring such

disproportionate impacts are not borne again by this community." (*Id.*)  Further,

in the Dale Station Area report for the CCLRT, the history of the area is set forth,

noting that the Summit-University area was home to the Rondo neighborhood, the

heart of St. Paul's African-American community prior to construction of I-94, and

that many former residents still live in the Summit-University area.  (FTA 9157.)

---

[12]  Plaintiffs also reference "urban renewal policies of the 1970s" as having had negative impacts on the community.  While the Court does not doubt that this is true, Plaintiffs do not offer any specifics as to what the policies were or their impact to the community. Thus, the Court's focus is on whether Defendants properly considered the past effects of the I-94 construction.

The record also reflects that Defendants were aware of the public's concern regarding disproportionate negative impacts to the Rondo neighborhood. For example, in the chapter addressing Public and Agency Coordination and Comments, the FEIS discussed the nature of comments received regarding Neighborhood Impacts at the AA/DEIS stage of review:

> The majority of comments received on the AA/DEIS concerning neighborhood impacts discussed the need to maintain community cohesion and character of the local neighborhoods, potential for land use changes and redevelopment within the corridor, and comments on livable communities.
>
> . . .
>
> *Community cohesion concerns were widely expressed by many community members, particularly in relation to the Rondo neighborhood in St. Paul. The current alignment runs through the Rondo neighborhood, the heart of St. Paul's African-American community that was devastated by the construction of I-94 in the 1960s. Community members from around the metropolitan area were concerned about maintaining the remaining neighborhood fabric and community cohesion.*

(FTA 1310-1311 (emphasis added).)

Aware of the concerns regarding the Rondo neighborhood, the FEIS examined the economic and social impacts that the CCLRT Project would have under existing conditions. This examination considered the past activities in the Rondo neighborhood. For example, in its discussion of indirect and cumulative impacts of the CCLRT Project, the FEIS evaluated the effects of the CCLRT Project on the quality and cohesion and community services of the twelve neighborhoods adjacent to the proposed light rail line, including the Midway East neighborhood. (FTA 750-788.) The record reveals that neighborhoods in and around Midway East were examined, such as Thomas-Dale,

Summit-University, and Hamline-Midway. Features and characteristics of Midway East are referenced repeatedly in the FEIS. With respect to Midway East, the FEIS noted that the CCLRT "is not expected to have long-term adverse impact [sic] on neighborhood cohesion or identity," that the "LRT should act as a catalyst for greater pedestrian activity," that "the project will reconstruct the street and sidewalks and provide a unified, clean landscape," and that the "stations are expected to become additional foci of activity and neighborhood assets." (*Id*. 751.) The FEIS also considered, at the neighborhood level, issues of income and poverty, housing and employment, racial and ethnic diversity, landmarks and community facilities, schools, places of worship, and public and subsidized housing. (*See generally* FTA 739-782.)

The FEIS explained that neighborhood concerns are also being addressed by other governmental bodies, such as the City of St. Paul, which adopted the Central Corridor Development Strategy ("CCDS"). The FEIS indicated that the CCDS is a key document used for planning and the FEIS referenced the CCDS in response to community concerns regarding neighborhood cohesion:

> The CCDS "establishes a vision and a set of strategies for how the Central Corridor should grow and change over the next 25-30 years in response to the LRT investment" . . . Serving as a framework for more detailed planning in the future, the CCDS outlines development standards and policies that would enable the *Central Corridor to become a pedestrian-oriented area that preserves current diversity, helps to balance various modes of transportation, and takes full advantage of the LRT investment to bring in new economic opportunities*.

(*Id*. 706 (emphasis added).) The vision of the CCDS is based on six main principles, including "[m]aintaining and 'lifting up' the existing, diverse neighborhoods and

businesses in the study area" and "[w]orking with neighborhoods and stakeholders to ensure the implementation of LRT is as successful as possible." (*Id.* 706-707.) The FEIS also referenced the CCDS in response to concerns regarding community cohesion:

> To address these concerns, the City of St. Paul adopted the [CCDS]. The strategy contains a set of guidelines for development at and around stations locations including parks, connections to the neighborhoods, building mass and design, and other guidelines to reflect and enhance neighborhood character.

(*Id.* 1310.)

In addition, the FEIS acknowledged that the LRT alignment in the middle of University Avenue raised concerns about "connectivity between neighborhoods north and south of the tracks." (*Id.* 784.) In response, the FEIS explained that "no visual barrier, however, will be placed across University Avenue" and that "most currently legal pedestrian crossings will be maintained, and in many cases, will be enhanced." (*Id.* 784.) The FEIS also explained that:

> The Central Corridor LRT is not intended to act as a barrier to any community, but rather to enhance the access to both the adjacent communities and the metropolitan region. Physical infrastructure enhancements that will occur as a result of the project will allow for safer street crossings and improved circulation in the adjacent neighborhoods.

(FTA 1311.)

Chapter 3 of the FEIS discussed related social conditions in the corridor and potential effects of the LRT. Specifically, this chapter addressed potential impacts on socioeconomics, neighborhoods, community service and cohesion, cultural resources, and environmental justice. In its discussion on environmental justice, the FEIS relied on population data to identify minority and low-income populations in the CCLRT area.

(FTA 870-872.)  The FEIS used this data to identify potential disproportionate adverse impacts of the CCLRT.  (*Id.* 880.)

In its discussion of potential environmental justice issues, the FEIS examined both long-term implications for environmental justice communities and short-term construction impacts.  (*Id.* 868.)  The FEIS compared the effects of each alternative to protected population on air quality, noise, vibration, parking, traffic accessibility, community cohesion, acquisitions and displacements, and placement of system components.  (*Id.* 881.)

Chapter 9 of the FEIS examined the indirect and cumulative impacts of the CCLRT Project.  (FTA 1242-1278.)  The FEIS explained that this analysis takes into account the "[e]xisting condition of each potentially affected resource and how it has been affected by other actions (public or private) described in previous chapters of the FEIS" and the "[s]tatus/viability and historical context of each potentially affected resource and how these may affect the potential for indirect and cumulative impacts."  (FTA 1244.)  This examination includes an analysis of the impacts on the environmental justice communities.  Specifically, the FEIS examined the "existing condition" of environmental justice communities and how they have been affected by "other actions" and "present and reasonably foreseeable future actions."  (FTA 1260.)

> Environmental justice populations, specifically low-income and minority populations, live in the Central Corridor.
>
> The study area is predominantly inhabited by non-Hispanic Whites.  Ethnic minority populations, however, comprise a significant portion of study area population (22 percent), and account for a higher total minority populations percentage than Hennepin County (19 percent) and slightly less than

Ramsey County (23 percent). Within the study area, the Asian population represents the greatest ethnic minority group next to non-Hispanic Whites.

The Central Corridor includes the Rondo neighborhood—the heart of St. Paul's African-American community.

The percentage of people at poverty level for the Central Corridor (one-half mile from the alignment) is estimated to be nearly three times greater than the region's percentage. . . .

 . . .

The City of St. Paul CCDS (April 2007) contains an Inclusive Housing strategy that is intended to mitigate the potential displacement of low-income individuals and families from the corridor as property values rise. Three specific strategies are identified including supply-side financial incentives, supply-side regulatory incentives, and home ownership assistance.

The Metropolitan Council has committed to mitigating the identified adverse impacts addressed in this FEIS . . . [and] . . . to working toward resolution of community concerns that don't rise to the level of state or federal standards of adverse impacts.

(*Id*.)

The FEIS goes on to discuss a number of accommodations added to the project to enhance community cohesion in direct response to community concerns. (*Id*. 886.) These accommodations include the addition of "non-signalized pedestrian crossings" to "ensure that pedestrians will be able to cross University Avenue at virtually every legal crossing that currently exists," the reconstruction of sidewalks along University Avenue, and the addition of associated streetscape elements. (*Id*. 866-67.) Additional adjustments were made to the CCLRT Project to account for potential adverse impacts to Plaintiffs' community. For example, the FEIS noted the inclusion of noise and vibration minimization, noted proportionately less loss of parking in environmental justice areas,

and rejected the option of widening an intersection to avoid the demolition of existing minority businesses.  (FTA 882, 883, 885-886, and 887.)

The FEIS also found that the CCLRT Project is consistent with several Neighborhood Plans, including plans in Midway East.  These Plans indicated the neighborhoods' desires to maintain their diversity, to encourage development that is compatible with the neighborhood, and to limit gentrification.  (FTA 715, 744, 747-48.)

Based on its careful review of the record, the Court concludes that the FEIS complies with NEPA's requirements with respect to its cumulative impact analysis.  The record demonstrates that Defendants took a "hard look" at the cumulative impacts of the proposed action and did not act arbitrarily or capriciously in its consideration of the cumulative impacts of past activities in the Rondo neighborhood.  The administrative record demonstrates that the Agencies acknowledged and were cognizant of the fact that the Rondo neighborhood had been negatively impacted and nearly destroyed by the construction of I-94.  The administrative record also demonstrates that the Agencies considered the comments and concerns directed at any such cumulative impacts, and considered issues of community cohesion and connectivity as they relate to the Rondo area.  Finally, the Agencies considered the potential adverse impacts of the CCLRT project on the Rondo neighborhood and concluded that despite these potential impacts, the CCLRT will provide substantial benefits to the environmental justice community.  NEPA ensures that agencies do not act on incomplete information, *Marsh*, 490 U.S. at 371, and prohibits uninformed, not unwise, agency action.  *Robertson*, 490 U.S. at 351.  Here, the Court concludes that the Agencies were fully informed concerning the

cumulative impacts of the CCLRT project and that the Agencies' analysis of cumulative impacts complies with NEPA.[13]

In so holding, the Court reminds the Agencies of their commitment to "working toward resolution of community concerns that don't rise to the level of state or federal standards of adverse impacts." (FTA 1260.) While the Court concludes that the Agencies have not violated NEPA in their environmental analysis of cumulative impacts, this does not diminish the valid concerns of those in the affected neighborhoods, and in particular the Rondo neighborhood that was devastated by the construction of I-94, regarding the future of their communities. The Court hopes and expects that the Agencies will continue to honor their commitment to resolving community concerns going forward, despite their technical compliance with NEPA.

### B.    Business Interruption

Plaintiffs also assert that the FEIS does not adequately address or consider mitigation of the business interruption caused by the construction of the CCLRT. Specifically, Plaintiffs assert that the FEIS fails to analyze the duration, quality, or scope

---

[13]    Plaintiffs take particular issue with the conclusion in the administrative record that "there are no disproportionately 'high and adverse' effects on minority and/or low-income populations" and that the "potential adverse effects are not predominantly borne by a minority or low-income populations [sic]," but rather that "the potential adverse effects are shared by all populations along the proposed route, including non-minority and non-low-income." (FTA 18.) While perhaps true in a technical sense with respect to the Agencies' NEPA review, the Court understands how such phrasing might seem insensitive considering the history of I-94 and the fact that the CCLRT will run directly through neighborhoods with predominantly low-income and/or minority populations.

of construction-related impacts, and that the FEIS fails to adequately identify or analyze diminished business revenue as an adverse impact. Plaintiffs also assert that Defendants failed to adequately discuss mitigation of these impacts.

Defendants argue that the FEIS adequately identified business impacts from the CCLRT, addressed Plaintiffs' business interruption concerns, and considered appropriate mitigation measures.

In the chapter addressing potential social effects of the CCLRT Project, the FEIS discussed short-term construction effects:

> Preferred Alternative. Possible short-term construction impacts include inconvenience to patrons of businesses, clients of community facilities, patients of medical clinics and hospitals, and those attending schools and places of worship along the corridor. With the closure of portions of streets during construction, these residents and patrons, as well as medical and emergency service responders, will be directed to alternate routes to gain access to homes and businesses. Alternative access points will need to be provided for buildings on the alignment particularly during sidewalk reconstruction. Where the grid pattern of streets is discontinuous, residents and patrons may experience some delays in gaining access to homes and businesses near construction.

(FTA 786). The FEIS also discussed mitigation strategies with respect to air quality impacts, noise impacts, vibration impacts, and electromagnetic field impacts. (FTA 931, 969, 996, 999, 1019, 1021.) With respect to short-term effects of construction on local businesses, Defendants noted several mitigation strategies. For example, in response to comments received regarding impacts to businesses during construction, the FEIS stated:

> The Metropolitan Council is responsible for construction mitigation activities. This includes developing and implementing a construction communication plan that provides multiple ways people can get construction information and submit comments or concerns. People can get current information from the weekly construction updates, monthly

newsletter, construction updates webpage, construction meetings and conversations with the outreach staff.  People will be able to submit comments via the general project office phone number, online comment form, standard project email or contact with their community outreach coordinator or resident engineer.  The community outreach staff and the resident engineers will work closely with impacted businesses and properties to maintain access and minimize impacts during construction.

The Metropolitan Council is also coordinating with local organizations, foundations and non-profits that are providing business assistance.  The Central Corridor Partnership is working on developing a corridor wide brand and marketing campaign to bring customers into the corridor before, during and after construction.  The University Avenue Business Preparation Collaborative's mission is to assist existing small businesses along University Avenue "survive and thrive" before, during, and after the construction of the Central Corridor LRT.  They have hired two small business consultants, established a business resource center and hired two marketing interns.  The Central Corridor Funders Collaborative has raised funds to support these organizations with implementation.  The Energy Innovation Corridor collaborative is looking at ways to make businesses and properties more energy efficient.

(FTA 88-89.)  Defendants also provide an overview of construction mitigation measures:

The Metropolitan Council is taking the lead on strategies to mitigate construction impacts including:

- Providing 30-day construction notice
- Noticing utility shutdown 2-3 days in advance
- Providing complaint forms
- Providing 24-hour phone
- Developing access plans
- Responding to emergencies
- Providing public informational meetings
- Maintaining website with construction information
- Providing directional signage, variable message signs, construction site information such as contact information and anticipated completion date.

. . .

The Metropolitan Council is also coordinating with several groups, such as

the Central Corridor Funders Collaborative, Metropolitan Consortium of Community Developers, Neighborhood Development Corporation, Central Corridor Partnership, University Avenue Business Association, and the University Avenue Business Preparation Collaborations (a.k.a. U7, which consists of 7 community development corporations in the corridor including one of the complainants Aurora St. Anthony NDC) and many other organizations that are developing plans to assist businesses through construction.

(FTA 10689.)

In the Chapter discussing Public and Agency Coordination Comments, the FEIS noted many comments expressing concern for the small businesses along the Central Corridor project line, particularly related to "potential financial hardships that could occur during construction."[14]  (FTA 1306.)  Other comments related to support and consideration of minority businesses.  (*Id*.)  In response, the FEIS noted:

> The Central Corridor LRT Project will address potential construction impacts by providing information about detours with signage, and advance notices.  Maintenance of traffic and sequence of construction would be planned and scheduled to minimize traffic delays and inconvenience.  Best Management Practices (BMPs) would include working with business-owners to provide an alternate access to their businesses if necessary, giving them adequate notice about construction plans and phasing, keeping access to bus stops open, and alerting the public to detours.  In addition, the Central Corridor Partnership, an alliance of St. Paul and Midway area business leaders, will be providing assistance to help businesses with marketing strategies and business planning to survive the construction process and let their customers know they are still open.
>
> The outreach staff will be key in notifying businesses and residents of construction plans, road closure, and bus re-routes, as well as being a point of contact for construction related emergencies such as power outages.  For this reason, from May to August 2008, Outreach Coordinators went

---

[14]     Comments also related to potential financial hardships related to altered traffic patterns, increases in rent, land value or taxes, and changes to parking.  (FTA 1306.)

door-to-door surveying businesses, and in October 2008 a series of business
listening sessions were held to identify outstanding concerns and to start
planning for construction including identifications of the best strategies for
communicating with businesses.  The Central Corridor LRT Project
outreach team has and will continue to engage the public in the preliminary
engineering process and into construction.

Land development and property taxation policies are principally the
responsibility of the cities of Minneapolis and St. Paul.  Both cities have
adopted comprehensive land use and development strategies or are
updating plans and policies to reflect projected land use development
changes with the construction and operation of the Central Corridor LRT
project.  In St. Paul's Central Corridor Development Strategy and the
Minneapolis Plan for Sustainable Growth, land use changes are a function
of market changes, and these plans attempt to mitigate the market forces.

(FTA 1306-1307.)

In the ROD, the FTA found that the Metropolitan Council took "all reasonable,

prudent and feasible means to avoid or minimize impacts from the Preferred Alternative."

(FTA 14.)  In addition "FTA will require that the Metropolitan Council periodically

(quarterly) submit written reports on their progress in implementing required mitigation

measures."  (*Id.*)

The crux of the parties' dispute over the adequacy of the FEIS's analysis of

construction impacts on local businesses relates to whether Defendants appropriately

identified and analyzed diminished business revenue as an adverse impact.  The

Metropolitan Council asserts that the FTA properly addressed business interruption,

relying on the record discussed above.  The Metropolitan Council asserts that the

potential loss of business revenue is speculative and, even so, that Defendants adopted

appropriate mitigation measures to assist business owners along the LRT route.  Federal

Defendants argue that the analysis was sufficient because the extent to which a particular

business might experience a reduction in revenue caused by construction is speculative and, even if temporary losses are inevitable, NEPA does not require agencies to analyze potential impacts on a business's revenues. Federal Defendants also argue that even though it was not required, the FEIS discussed ways to mitigate construction impacts to businesses.

The Court first considers whether NEPA requires, in this case, an analysis of potential impacts on business revenues. Federal Defendants rely on four cases for the proposition that NEPA does not require such an analysis. These cases, however, are all distinguishable because they address the issue of whether a party suffering exclusively economic harm has standing to sue under NEPA.

For example, in *Nevada Land Action Association v. United States Forest Service*, the Court held that a ranchers' association lacked standing to challenge a national forest plan that would result in decreased grazing levels because the association's interest was not within the "zone of interests" protected by NEPA. 8 F.3d 713, 716 (9th Cir. 1993). The Ninth Circuit Court of Appeals noted that the association challenging the forest plan alleged both economic and "lifestyle" injuries, but that the association did not allege that the increased grazing levels that they sought would benefit the environment. *Id.* The Ninth Circuit explained that the association "cannot invoke NEPA to prevent 'lifestyle loss' when the lifestyle in question is damaging to the environment." *Id.*

Similarly, in *Ashley Creek Phosphate Co. v. Norton*, the Ninth Circuit Court of Appeals held that a phosphate company that held leases that were approximately 250 miles away from the affected area lacked standing to bring a NEPA challenge to a land

management plan. 420 F.3d 934, 938-939 (9th Cir. 2005). With respect to prudential

standing, the Ninth Circuit explained that the company's interest was "purely financial"

and not linked to the physical environment being impacted. *Id*. at 939-40. *See also Town*

*of Stratford v. Federal Aviation Admin.*, 285 F.3d 84, 88-89 (D.C. Cir. 2002) (holding

that the petitioner lacked standing to assert a NEPA claim challenging the FAA's

decision to approve an airport reconstruction plan; explaining that petitioner lacked an

environmental interest because petitioner did not link its claimed economic injury to any

environmental effect); *Taubman Realty Group Ltd. P'shp.*, 320 F.3d 475, 481 (2003)

(affirming the dismissal of a NEPA for lack of standing where the plaintiff's grievance

did not fall within the "zone of interests").

Unlike the plaintiffs in the above cases, here there is no dispute that the Plaintiffs

are within the "zone of interests." There is no question that the CCLRT will produce

substantial environmental impacts in the Central Corridor and that Plaintiffs reside in that

corridor. The record also supports the conclusion that these environmental impacts will

be connected to economic impacts; namely that businesses directly impacted by the

environmental effects of constructing the CCLRT will likely experience a decline in

business revenue. The Court concludes that the impact of lost business revenue,

therefore, is directly related to the environmental impacts (i.e., physical disruption of the

environment) of the CCLRT Project. The Court also concludes that these impacts must

be discussed in the FEIS.[15]  Once the impacts are discussed, the Agencies can make sure that their mitigation measures are adequate.  Because lost business revenue was not specifically analyzed in the FEIS, the FEIS is deficient in this regard.

### C.  Displacement of Existing Businesses and Residents

Plaintiffs argue that the FEIS does not sufficiently analyze or consider mitigation of the CCLRT Project's displacement of businesses and residents due to resulting increased property taxes and rents on properties within walking distance of the light rail line.  The Federal Defendants submit, and the Court agrees, that Plaintiffs' argument relates to the "gentrification" of the area.[16]  In particular, Plaintiffs argue that Defendants did no analysis with respect to the timing or extent of property tax increases, the existing residents' and businesses' tolerance for tax increases, or the expected number of residents or businesses that are vulnerable to displacement or "gentrification."

While the FEIS indicated that the CCLRT is expected to benefit the communities in the Central Corridor by, for example, increasing transit services, improving streetscape environment, increasing commercial and residential development, and increasing employment opportunities, the FEIS also recognized that these benefits will not be

---

[15]     The Court recognizes that economic injury *alone* does not require preparation of an EIS under NEPA.  *See, e.g.*, *Town of Stratford*, 285 F.3d at 88-89.  However, the potential for lost revenue of businesses on the LRT path here is directly connected to the environmental impacts of the CCLRT.

[16]     As Federal Defendants also point out, the term "displacement" is used in the FEIS to refer to the government's acquisition of land pursuant to its powers of eminent domain. No businesses or residents in Plaintiffs' community will be acquired by the government.

without costs.  The FEIS explained that "the Central Corridor Development Strategy (CCDS) and station area plans have been created to guide development generated by construction of the LRT in the Central Corridor, *which include efforts to minimize the potentially adverse effects of market forces. . . .*"  (FTA 787 (emphasis added).)  In addition, in its discussion of Economic Effects, the FEIS acknowledged that property values along the Central Corridor, at least for properties within 1/2 mile of a station, are expected to increase.  (FTA 1079-1080.)  Moreover, in its discussion of cumulative impacts, the FEIS identified gentrification as a potential effect of development along the Central Corridor:

> In recent years, the Midway area has experienced growth in multifamily housing and new commercial/office enterprises.  These development activities are expected to continue along the corridor in response to market demand.  The City of St. Paul CCDS (April 2007) contains an Inclusive Housing strategy that is intended to mitigate the potential displacement of low-income individuals and families from the corridor as property values rise. . .  Underutilized land and buildings near some station areas that are now prime development and redevelopment sites will be built out.  More housing opportunities will be available for current residents in the corridor, but population composition and neighborhood character may change as new residents move into the neighborhoods (gentrification) to take advantage of transit.

(FTA 1257.)  In addition, in its responses to comments regarding environmental justice, the FEIS again recognized the potential impacts on low-income individuals due to property value increases and referred, again, to the City of St. Paul's housing strategy aimed to mitigate potential displacement.

> [The CCDS] seeks to stabilize natural market forces in the neighborhoods adjacent to the Central Corridor and create a set of guidelines for the development, in effort to retain existing businesses located along the corridor.  Additionally, the Metropolitan Council's Livable Communities

program has allocated up to $1 million dollars to the City of St. Paul to assist with the purchase of land to be used later for affordable housing near the Preferred Alternative alignment.

(*Id*. 888.)  Further, the FEIS provided:

The City of St. Paul CCDS (April 2007) contains an Inclusive Housing strategy that is intended to mitigate the potential displacement of low-income individuals and families from the corridor as property values rise.  Three specific strategies are identified including supply-side financial incentives, supply-side regulatory incentives, and home ownership assistance.

The Metropolitan Council has committed to mitigating the identified adverse impacts addressed in this FEIS as determined under the FTA Title VI Circular.  The Metropolitan Council has also committed to working toward resolution of community concerns that don't rise to the level of state or federal standards of adverse impacts.

(FTA 1260.)

The FEIS also noted that many comments were received regarding small businesses and "increases in rent, land value or taxes" (FTA 1306)  and potential impacts on property values:

Numerous comments were received on the AA/DEIS that raised questions regarding potential impacts of the alternatives under consideration on the value of property.  The comments focused on LRT as the likely preferred alternative and how this new investment might trigger new development at stations and renew interest in the residential property in the corridor.  The potential for gentrification was a common theme that was described.  Generally, commentors voiced concerns over likely increases in property value and their property tax and that this would contribute to the movement of current residents out of the neighborhood.  Suggestions for rent control, subsidy, and freezes on property taxes were common.

These issues were very important to the Metropolitan Council as well as the cities of St. Paul and Minneapolis and Ramsey County.  It is likely that increased access brought by transit improvements may act as a catalyst for new investment.  In anticipation of new and transit-oriented development (TOD), St. Paul adopted the *Central Corridor Development Strategy*

(October 2007) (described in Section 3.1 and Chapter 5).  The strategy includes Transit Opportunity Zones (TOZ) that would overlay existing zones and guide new development.  The strategy contains an Inclusive Housing strategy that is intended to mitigate the potential displacement of low-income individuals and families from the corridor as property values rise.  Further, specific strategies are identified in this plan for home ownership assistance.

(FTA 1308.)  The ROD also addressed the "Potential for Gentrification to Dislocate Community and Affect Community Cohesion."  In particular, the ROD explained:

> Several commenters raised concerns about the potential for gentrification to dislocate the existing communities adjacent to the Central Corridor LRT.
>
> **RESPONSE**:  The FEIS discussed planning efforts and other activities that would limit the potential for adverse secondary and cumulative effects.  The City of St. Paul addressed this concern in their *Central Corridor Development Strategy*, which identifies areas of stability and areas of change.  The areas of stability identified in this planning document are primarily the residential areas north and south of University Avenue and the vibrant business areas along University Avenue.  The areas of change are areas identified for redevelopment including property surrounding the planned LRT stations, vacant auto dealerships and underutilized auto-oriented malls and parking lots.  The [CCDS] was adopted by the City Council as a chapter of the Saint Paul Comprehensive Plan on October 24, 2007.

(FTA 89.)  The ROD also noted that the City and the Metropolitan Council have provided grants for affordable housing and redevelopment along the Central Corridor and summarized the Metropolitan Council's funding to support such affordable housing activities.  The FEIS explained that:

> In addition to adoption of land use policies, the City and Metropolitan Council have provided grants for affordable housing and redevelopment along the corridor.  Following is a summary of Metropolitan Council funding to support affordable housing activities in the corridor:
>
> - In 2007, the Metropolitan Council awarded a $1.05 million grant for a mixed use development at the intersection of Dale and University

that will include 46 units of affordable housing. . . .

- In 2008, the Metropolitan Council awarded a $150,000 grant to assist Model Cities in the acquisition and renovation of foreclosed/vacant homes in Thomas-Dale and Summit-University.
- In 2008, the Metropolitan Council authorized a $1 million loan to help the City of St. Paul with land acquisition for affordable housing near the Central Corridor LRT route along University Avenue.
- In 2009, the Metropolitan Council approved $448,800 for asbestos abatement at a vacant nursing home on Lexington Parkway North near the future Central Corridor LRT line. The building will be converted into 48 supportive apartments for people who have been homeless for a long time.

(FTA 89-90.) The FEIS also documented funding provided by the City of St. Paul for affordable housing activities. (*Id*. 90.)

After careful review of the FEIS and the administrative record as a whole, the Court concludes that the FEIS' discussion of the potential displacement of existing businesses and residents through gentrification, and the related mitigation measures, was sufficient. The record demonstrates that Defendants took a "hard look" at the potential impacts of gentrification and did not act arbitrarily or capriciously in its consideration of these impacts or the related mitigation measures.

### D.  Requisite Scope

Finally, Plaintiffs assert that the FEIS lacks the requisite scope because it omits at least one light rail station entirely.

The initial AA/DEIS for the CCLRT project included a proposed University Avenue LRT route. The FEIS noted that in response to concerns of both residents and stakeholders regarding the spacing of stations between Rice Street and Lexington Parkway in St. Paul, the SDEIS evaluated three additional "future infill stations" to be

built along University Avenue at Hamline Avenue, Victoria Street, and Western Avenue. (FTA 679, 696.)  These additional stations were aimed at increasing access to the neighborhoods and businesses.  (*Id*.)  The SDEIS examined the social, economic, and environmental impacts of the three potential stations.  (*Id*. 696, 12949-12985.)  As to the analysis of the future infill stations in the SDEIS, the FEIS explained:

> The inclusion of new stations addressed concerns of residents and stakeholders, including the City of St. Paul and Ramsey County, to increase access to the neighborhoods and businesses.  The locations of these stations would reduce the station spacing from approximately one mile to one-half-mile along University Avenue in this portion of the Study Area. The SDEIS evaluated implementation of each of these stations; however, ridership analysis conducted during the SDEIS did not support the inclusion of these new stations.  The SDEIS project definition was amended to include below grade infrastructure to allow for station construction at a future date when funding availability and ridership merited construction.

(*Id*. 679.) [17]  The MET Council indicated that it intended to construct these three stations when funding became available.  (*Id*. 696.)  The "anticipated platform configuration for these stations" was explained in the FEIS.  (*Id*. 696.)

After the ROD was published, a commitment for local funding was received to build one above-grade infill station in Midway East—at Hamline Avenue, Victoria Street, or Western Avenue.  (FONSI 4.)  Because the FEIS analyzed the impacts of the below-grade infrastructure but not the above-grade stations, Defendants initiated an EA to determine whether building out the stations would have a significant environmental

---

[17]     It was also determined that the inclusion of the future infill stations would have a detrimental effect on the project's Cost Effectiveness Index ("CEI") by increasing the CEI to a point exceeding the FTA threshold.  (FTA 87, 12956.)  The effect on the CEI would affect the project's eligibility for federal funding.  (FONSI 10.)

effect and if any such effects differed from those already considered in the FEIS.

(FONSI 10-13.)  The Infill Station EA analyzed the purpose and need for the proposed action, alternatives considered, as well as the social, economic, environmental, transportation, and the indirect and cumulative effects of constructing the three stations.

(FONSI 18-59.)  In its analysis, the EA relies on the FEIS and noted that:

> This Infill Stations EA focuses on issues where impacts would differ with full construction of the infill stations, as opposed to installation only of below-grade infrastructure.  In the event there is no difference in impact, this Infill Stations EA will refer to the appropriate section of the FEIS where impacts were discussed.  If the impacts of full construction are different from installation of only below-grade station infrastructure, this Infill Stations EA will fully describe these impacts, present the results of technical analyses completed, and discuss required mitigation measures.

(FONSI 13.)  The EA concluded that:

> The construction of one or more of the three Central Corridor LRT infill stations would have incremental changes to resource area impacts as summarized above.  The incremental changes are minor and the impacts are not significant.  No additional mitigation, beyond mitigation committed in the Project's FEIS and ROD, is required as part of construction of one or more of the three potential infill stations.

(FONSI 17.)  In particular, the EA explained:

> All resource areas covered in the FEIS were reviewed for this Infill Stations EA.  Changes to anticipated impacts that would result from full construction of the three potential infill stations are described and the results of analysis presented in the EA along with required mitigation measures, if any.

> The following resource areas . . . will experience impacts from the above-grade construction and operation of the potential infill stations.  Overall, however, the potential infill stations will not significantly impact or adversely affect the surrounding community and no additional mitigation will be required beyond the project sponsors' standing commitment to analyze and evaluate mitigation issues consistently for all Midway East stations.

(FONSI 14.)  And with respect to environmental justice, the EA explained:

> The three potential infill stations within the Project area were analyzed for
> environmental justice impacts in the FEIS, therefore the long-term and
> short-term adverse impacts disproportionately borne by minority and
> low-income populations would be the same as those identified in the FEIS.
> An incremental benefit to constructing the infill stations in their entirety
> during initial Project construction would be minimized construction
> impacts to businesses, residents, non-profits, and community centers.
> Construction of the above-grade elements for one or more of the potential
> infill stations will likely increase access to transit service for Midway East
> residents and businesses.  A full analysis of these effects will be conducted
> as part of completing the targeted transit service plan required as mitigation
> for environmental justice impacts identified in the FEIS.  . . .

> Possible short-term construction impacts include inconvenience to business
> patrons, community facilities clients, medical clinic and hospital patients,
> and those attending schools and places of worship.  Existing plans for the
> Project already include full below-grade infrastructure construction for the
> potential infill stations.

> All mitigation committed to in the FEIS will be implemented.  Construction
> of one or more of the infill stations will be factored into consideration when
> the Metropolitan Council completes its targeted transit service plan, as
> committed to for mitigation of adverse environmental justice impacts noted
> in the FEIS.  No additional mitigation of effects is required.

(FONSI 15.)  The Infill Stations EA further notes that the three infill stations will be

constructed "in accordance with the design features and mitigation measures for the other

stations in the Midway East segment, as detailed in the ROD and the FEIS" and that the

above-ground construction is not anticipated to add to the duration of the CCLRT Project.

(FONSI 309.)

Plaintiffs assert that because the additional infill stations are not included in the

FEIS, the FEIS is deficient as a matter of law.  In addition, Plaintiffs argue that rather

than preparing the Infill Stations EA, Defendants were required under NEPA to prepare a supplemental EIS for the entire project.

As explained above, NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency may, however, first prepare an EA to determine whether an EIS is required. 40 C.F.R. § 1508.9(a)(1). Moreover, after preparing an EIS, an agency may prepare EAs for smaller, subsequent actions included within the broader program. *Newton*, 141 F.3d at 809. An agency is required to supplement the EIS if substantial changes are made to the proposed action or new information arises that will affect the quality of the human environment "in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374. An agency's determination of whether to supplement an EIS is based on the "rule of reason" and should be set aside by a reviewing court if a decision not to supplement was "arbitrary or capricious." *Id*. at 373, 375.

Here, the Court concludes that Defendants' decision not to prepare a supplemental EIS for the three additional infill stations, but instead to prepare an EA for these stations, was neither arbitrary nor capricious. The record supports the Agencies' conclusion that the three stations would not have a significant impact in a manner not already addressed in the FEIS.

## IV. Injunctive Relief

Plaintiffs assert that the appropriate remedy on the facts of this case is an injunction compelling compliance with NEPA before further construction of the CCLRT.

The traditional four-factor test applies to requests for injunctive relief in a NEPA case. *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010). Accordingly, an injunction is warranted where a plaintiff demonstrates (1) it is likely to suffer irreparable harm; (2) remedies at law are not adequate; (3) the balance of equities weigh in plaintiff's favor; and (4) the injunction is in the public interest. *Id.* at 2756. *See also Taylor Corp. v. Four Seasons Greeting, LLC*, 403 F.3d 958, 967 (8th Cir. 2005). "[A]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto*, 130 S. Ct. at 2761.

Here, Plaintiffs have succeeded on one of their NEPA claims. Particularly, Plaintiffs have demonstrated that the FEIS is inadequate insofar as it fails to address the loss of business revenues as an adverse impact of the construction of the CCLRT. Accordingly, Defendants must supplement its analysis of business interruption impacts. Plaintiffs have not, however, demonstrated that injunctive relief is warranted. Construction in the Midway East area of the corridor is not imminent and Plaintiffs have not made a showing that the agency will be unable to remedy the FEIS prior to the commencement of construction in that area. In addition, Plaintiffs have not demonstrated that the insufficiency in the FEIS cannot be remedied by further NEPA analysis and consideration of additional mitigation measures. Finally, and perhaps most importantly, Plaintiffs have not established that the balance of harms favors Plaintiffs or that the injunction would benefit the public interest. Indeed, the contrary appears to be the case. The record demonstrates that, despite Plaintiffs' concerns with the sufficiency of the FEIS, there are significant public benefits to the CCLRT project. At this stage, the Court

concludes that the interest of the general public to keep this important project moving forward outweighs the harm to Plaintiffs.  Accordingly, the Court declines to vacate the ROD or to enjoin the CCLRT project.  Instead, the Court directs Plaintiffs to comply with NEPA requirements consistent with this Order.

## CONCLUSION

The Court has concluded that the FEIS was deficient in its consideration of lost business revenue as an adverse impact of the construction of the CCLRT.  The Court has also concluded that the FEIS is not deficient in its analysis of cumulative impacts of prior projects or the potential displacement of existing businesses and residents due to the gentrification of the area.  Despite the latter rulings, the Court recognizes the validity and magnitude of Plaintiffs' concerns with respect to the impact that the CCLRT Project could have on the previously disrupted Rondo community and the potential impact that gentrification could have on low-income and minority populations.  While the Court has concluded that the Defendants complied with the procedural requirements of NEPA, the Court expects that Defendants will continue to work with Plaintiffs to address Plaintiffs' concerns.  Indeed, Defendants specifically represented that they are committed to resolving community concerns that do not rise to the level of a NEPA violation.  If the relevant groups—including the Metropolitan Council, the City of St. Paul, and Ramsey County--fulfill their commitments to mitigate the displacement of the impacted communities due to gentrification of the area and to minimize impacts to the Rondo community, they will revisit these issues with Plaintiffs and resolve them in the best interest of all concerned.

The Court is hopeful that with further discussions and negotiations between the parties, along with the implementation of the mitigation measures discussed in the record, Plaintiffs' racially, ethnically, and culturally diverse community will avoid disproportionate impacts from—and will experience the anticipated benefits of—the CCLRT Project. The communities within the Central Corridor deserve no less.

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment (Doc. No. [24]), Federal Defendants' Motion for Summary Judgment (Doc. No. [39]), and the Metropolitan Council's Motion for Summary Judgment (Doc. No. [32]) are **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. The FEIS is inadequate insofar as it fails to address the loss of business revenues as an adverse impact of the construction of the CCLRT.

   b. Defendants shall supplement the FEIS consistent with this Order.

   c. Plaintiffs' request for an order enjoining the CCLRT Project is denied.

Dated: January 26, 2011                     s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge